THE PEOPLE *ex relatione* WILLIAM K. STEPHENSON, *v.* SAMUEL S. MARSHALL, Judge of the Twelfth Judicial Circuit.

## APPLICATION FOR MANDAMUS.

The legislature cannot abolish counties, and form the territory of which they were composed into one or more counties, without submitting the act to a vote of the inhabitants affected by the change.

A county seat cannot be removed without the affirmative vote of the inhabitants of the county.

Territory cannot be taken from one county and added to another, except by the vote of a majority of the inhabitants of the counties to be changed.

This was an application to the Supreme Court for a peremptory mandamus. The petition of William K. Stephenson, sets out, That by an act of the General Assembly, approved February 25th, 1847, the county of Gallatin was divided, and that the county of Saline, forming a part of it, was organized, and a county seat established at Raleigh, in said county. That the petitioner was a resident of, and voter in the county of Saline. That said county of Saline has been recognized as a county, and that by law, Circuit Courts were held in Saline county, on the next Monday after they were held in Gallatin county; the county, of Saline, being one of the counties composing the third Judicial Circuit. That afterwards by virtue of an act of the General assembly, the county of Saline was made a part of the twelfth Judicial Circuit, the Courts therein, to be held at Raleigh, on the Mondays following the sitting of the Courts in Hamilton county. That by virtue of an act of the General Assembly, entitled "An act to create the county of Gallatin out of the counties of Gallatin and Saline," approved February 11th, 1851, it was enacted, that the said counties of Gallatin and Saline be abolished, and that all the territory therein embraced, should compose one new county, to be styled and known as the county of Gallatin, and that the county seat of said new county of Gallatin, should be permanently located at Equality. That said act further provided for the election of county officers for said new county of Gallatin, and the permanent organization thereof, which said elections have been held, and the officers have been elected, qualified and commissioned, and are discharging their duties. That Samuel S. Marshall, presiding Judge of the said twelfth Judicial Circuit, has organized his court in Gallatin, pursuant to the last abovementioned law, and is proceeding with the business

thereof, in violation of the Constitution of the State. That there is criminal and civil business pending, and undetermined, in the Circuit Court, in Saline county, and that the time for holding the Circuit Court therein has arrived. That the County Court of Saline county, regarding the last named law as unconstitutional and void, have notified and requested the Judge, to hold and convene a regular term of the Circuit Court, at Raleigh, in Saline county, without regard to the last named law, which the Judge has refused to do. Praying a mandamus ordering the Judge to hold the Court in Saline county, &c. To this petition, Judge Marshall answers, that it had been presented to him on the 26th day of May, 1851, at the sitting of the Gallatin Circuit Court, at Equality, and with a view to a speedy adjudication of the question, enters his appearance thereto, waives an alternative mandamus, or other process, and all technical objection. That he does not deny any matters of fact alleged in the petition, but admits them to be true. That he has refused to hold Court at Raleigh, in Saline county. That he will regard the provisions of the law, uniting the two counties of Gallatin and Saline, as constitutional and directory to him, until, by the order and judgment of the Supreme Court, he should be otherwise commanded.

After hearing of the cause, a peremptory mandamus was awarded.

A LINCOLN & R. WINGATE, for the Relator.

A. G. CALDWELL & H. B. MONTGOMERY, for the Respondent.

CATON, J. The Legislature, undoubtedly, was competent to pass this law, unless the exercise of such a power is clearly inhibited by the constitution. The first section of the seventh article of the constitution, provides, that "No new county shall be formed or established by the General Assembly, which will reduce the county or counties, or either of them, from which it shall be taken to less contents than four hundred square miles, nor shall any county be formed of less contents; nor shall any line thereof pass within less than ten miles of any county seat of the county or counties proposed to be divided." The second section provides, that "No county shall be divided, or have any part stricken therefrom, without submitting the question to a vote of the people of the county, nor unless a majority of all the legal

voters of a county voting on the question, shall vote for the same." The fourth section provides, that "There shall be no territory stricken from any county, unless a majority of the voters living in such territory, shall petition for such division ; and no territory shall be added to any county, without the consent of the majority of the voters of the county to which it is proposed to be added." Section five provides, that "No county seat shall be removed, until the point to which it is proposed to be removed, shall be fixed by law, and a majority of the voters of the county shall have voted in favor of its removal to such point." These are all the provisions of the constitution which, it is supposed, inhibited the passage of the law under consideration. The first section quoted, certainly is not offended by the passage of this law, either in letter or spirit. The object of that section is to prevent the reduction of large counties to small ones, or the creation of small counties, and also to prevent the running of new county lines too near county seats, already established. The effect of the law in question, would be to secure a larger county, instead of smaller counties, and hence the design of the convention, in framing the first section, is not disappointed. That section makes no provision for a vote of the people on the subject, and but for subsequent provisions, we think no question could be made, as to the validity of this law. This element, however, is introduced into the next section. That section, expressly inhibits the division of a county, or the taking any part therefrom, without an affirmative vote of the people of the county. The fourth section forbids, substantially, the same thing, unless a majority of the voters in the territory, which, it is proposed, shall be detached from one county and added to another, petition for the change ; and then before the act can take effect, a majority of the voters of the county to which the territory is proposed to be attached, must consent thereto. By force of these two sections, territory cannot be changed from one county to another, without, in the first place a petition of a majority of voters in the territory, and then the separate affirmative vote of both counties to be affected by the change. No rational mind can doubt, after the perusal of these provisions, that it was the unequivocal intention of the convention, that county lines already established, should not be changed, except by the deliberate vote of the people who might be affected thereby. To secure this right, and to prohibit all such changes of county lines,

against the wishes of the people, was manifestly a cherished object of the convention, in framing the constitution, and of the people in adopting it.

What then are the provisions, what the object, and what the effect, of the law under consideration? It provides for the abolition of the counties of Gallatin and Saline, and for the creation from their territory of the county of Gallatin. Its object and effect was to unite the two counties into one—to attach one county to the other, without the approbation of the people of the two counties. The design of the constitution is to prohibit things, not names. It is to forbid results and effects, and not the form of expression to be used in accomplishing them. A substance was sought after, and not a shadow. A real power was designed to be reserved to the people, and not the mere hope of a right.

We were asked if the legislature may not abolish a county organization, and then, from very necessity, attach the disorganized territory to another county, or form a new one? We answer unhesitatingly, that the legislature may not destroy a county, if the object, or necessary result, is to accomplish an unconstitutional purpose. Should the time ever arrive when any county in this State becomes entirely depopulated, then the legislature might repeal the law of its organization ; or, should we acquire new territory, from that, a new county might well be organized by the legislature alone, but to disturb county lines, already established, without a vote of the people, would be doing that which the constitution has forbidden in terms which, it seems to us, cannot be mistaken. The legislature cannot do indirectly, that which it is forbidden to do directly. This is a rule dictated by reason, and supported by the highest authority. Craig *v.* The State of Missouri, 4 Peters, 410. To be sure, it should not be applied, unless the end proposed to be accomplished is manifestly the very thing forbidden, but when that is clearly the case, no circumlocution can give validity to the forbidden act. Should this act be sustained, let it once be established, that the legislature may destroy old counties as it pleases, and from their territory create new ones, and every conceivable change of county lines may be effected, and that too, without any reference to a vote of the people, if the new county is of the requisite size.

The same legislature which passed this act, also passed an act creating the county of Kankakee, out of territory to be taken

from the counties of Will and Iroquois, and whence the necessity of submitting that act to a vote of the people of those counties, when, if this act is constitutional, the same thing could have been accomplished by abolishing the counties of Will and Iroquois, and then from their territory oganizing three new counties, giving to each precisely the same boundaries which they now have. So, too, in the same way might the county of Oregon have been created out of territory taken from the counties of Morgan, Sangamon and Macoupin, without a vote of the people of those counties. Nothing was requisite but to abolish those three counties and to create four new ones, and the desired end would be accomplished at once, and yet this same legislature, no doubt, in obedience to the provisions of the constitution, thought proper to submit the act creating the county of Oregon, to a separate vote of the people of the three counties, from which the territory of the new county was to be taken. Suppose the legislature had passed an act, simply providing that the territory of the county of Saline, should thereafter be attached to, and form a part of the county of Gallatin. Would it be pretended that such a law would be valid, without a vote of the people, simply because it transferred the whole county, instead of a part of it?

The object and effect of the law under consideration, is precisely the same as the one supposed. What possible difference is there, whether the two counties be abolished or annihilated, and of the same territory a new one formed, or one county is attached to the other? If the legislature cannot do the one, then it is prohibited from doing the other. No change of county lines can be made without, in effect, abolishing the old county organization, and creating a new one, so far as the territory transferred is concerned; and no additional authority is acquired, by affecting to do indirectly, what they must of necessity do, substantially, in all cases of the kind. This right of abolition or annihilation of county organizations, and the consequent results, if admitted as claimed in this case, would utterly destroy every provision of the constitution, the object of which, is to secure to the people interested, a direct control over legislative action affecting existing county organizations. If the constitution is still to be regarded as an instrument of that sacred character which has hitherto always been attributed to all American constitutions,— if it is still to be considered as a law to the law makers, as well

as to the citizens, a law which cannot be compassed or evaded, then, it is our duty to see that its material and substantial provisions are not frittered away by establishing a rule, which will in every instance, allow its provisions to be disregarded, which will permit the legislature to do the precise and identical thing which the constitution, in most express and unequivocal terms, has declared shall not be done, without the vote of the people interested.

There is, no doubt, a certain degree of plausibility in the course of argument, by which this law is attempted to be sustained. It is truly said that the constitution is a restraint upon legislative powers, and there is no doubt but this law might be passed, unless prohibited by the constitution. From this it is argued that, as there is no express prohibition to abolish counties, it is within the power of the legislature to do so, and from necessity, there must be authority to organize the disorganized territory. But this reasoning is more specious than sound. As we have before seen, it leads inevitably to the overthrow of the paramount law of the State. No means can be constitutional, which effect an unconstitutional object. While we would not extend the prohibitions of the constitution, so as to embrace measures and objects, not manifestly and clearly within the design of its framers, yet where that is undeniably the case, then by no means whatever, should it be allowed to be evaded. We cannot doubt that the objects designed to be accomplished by this act, cannot be effected without the affirmative vote of the people of the counties of Saline and Gallatin ; and for the reason that no provision is made for such a vote, we think it is in derogation of the constitution, and that it must continue inoperative, till an election shall have been provided for by law, and an affirmative vote obtained from the voters of each of the counties affected by the law.

The act in question, not only attempts to unite the county of Saline with the county of Gallatin, without the constitutional sanction of the people, but in effect, it also provides for the change of the county seat of Gallatin county, without the vote provided for in the fifth section of the seventh article of the constitution. This section, which I have quoted, forbids the removal of a county seat without a vote of the people of the county. This law, practically undertakes to remove a county seat by legislative action alone. For the reason, then, that no provision is made for taking

a vote of the people upon the removal of the county seat from Shawneetown to Equality, the law is also incomplete. The act in question, remaining inoperative as it does, the old county organizations continue, and it is the duty of the Circuit Judge to hold Circuit Courts in both counties, the same as if it had not been passed, and a peremptory mandamus must be awarded according to the agreed case.

*Mandamus awarded.*